IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**UNITED STATES OF AMERICA**

v.   Case No. 3:15cr194

**DEXTER LAMONT BROWN,**

**Defendant.**

## MEMORANDUM OPINION

On February 3, 2016, the Court granted Defendant Dexter Lamont Brown leave to file a motion to suppress. (ECF No. 15.) On that same date, Brown filed his Motion to Suppress. (ECF No. 16.) The United States filed a response in opposition. (ECF No. 17.) Brown filed a reply in support of his Motion. (ECF No. 18.) On February 24, 2016, the Court held a hearing on the pending motion. Following the hearing, the Court allowed submission of additional briefing. On March 10, 2016, Brown filed his supplemental memorandum. (ECF No. 21.) On March 15, 2016, the United States filed its supplemental response memorandum. (ECF No. 22.) Brown did not file a supplemental reply memorandum, and the time to do so has expired. For the following reasons, the Court will deny the Motion to Suppress. (ECF No. 16.)

### I. Procedural Background and Findings of Fact

#### A.  Procedural History

On December 15, 2015, the grand jury returned a two-count indictment against Brown. Brown was charged with possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841,[1] and possession of a firearm by a convicted felon, in violation of 18 U.S.C.

---

[1] 21 U.S.C. § 841 states, in pertinent part: "(a) Unlawful acts. Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--(1) to

§ 922(g)(1).[2] (ECF No. 1.) On February 2, 2016, the grand jury returned a superseding three-count indictment against Brown, repeating the same two counts as the original indictment and adding an additional count for possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).[3] (ECF No. 13.)

Brown filed a Motion to Suppress, arguing this Court must suppress the evidence against him because it was obtained pursuant to an unlawful stop and arrest in violation of his Fourth

---

manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a)(1).

[2] 18 U.S.C. § 922(g)(1) states, in pertinent part:

(g) It shall be unlawful for any person--

    (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year

. . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

[3] 18 U.S.C. § 924(c) states, in pertinent part:

(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--
    (i) be sentenced to a term of imprisonment of not less than 5 years . . . .

18 U.S.C. § 924(c)(1)(A)(i).

2

Amendment[4] rights. On February 24, 2016, the Court held a hearing on the Joint Motion to Suppress. Richmond Police Officer Benjamin Neifeld[5] ("Officer Neifeld" or "Neifeld") and Richmond Police Officer and Canine Handler Robin Robinson[6] ("Officer Robinson" or "Robinson") testified for the United States. The United States introduced into evidence: (1) an August 25, 2015 email; (2) a photograph of a red lunchbox, firearm, and small bag with a white substance; (3) Officer Robinson's resume; and, (4) the results of five certification tests completed by Officer Robinson's police canine, Sara. (Feb. 24, 2016 Hr'g U.S. Exs. 1–4). Brown introduced into evidence four photographs, one of an aerial view of the relevant addresses and three street view pictures of the 1600 block of Hickory Street. (Feb. 24, 2016 Hr'g Def. Exs.

---

[4] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[5] Officer Neifeld has served as a police officer with the Richmond Police Department for seven years. Since December 2012, he has worked with the Focus Mission Team ("FMT"), which focuses on street level narcotics. Neifeld has participated in over 50 narcotics investigations with the FMT. Beyond his training at the police academy, he has attended a one-day DEA surveillance school and a two-day course at "Northeast Counterdrug Training," concentrating on street-level narcotics trafficking and other crimes. (Hr'g Tr. 6, 35–37.)

[6] Officer Robinson has been a police officer for approximately 23 years. In 1998, she became certified as a canine handler by completing, along with her assigned canine, a 14-week basic school. In 2004, through the Richmond Police Department, Officer Robinson became a canine handler trainer by leading another 14-week school. She achieved similar certification as a canine handler trainer with the Virginia State Police in 2005. In 2011, Robinson became a master canine handler trainer with the Virginia Police Work Dog Association, a more rigorous certification process that requires a recommendation, written test, interview, and a board vote. As a master trainer, Officer Robinson must maintain her certification through continuing education and work to certify other canine-handler teams.

A1–A4.) Finally, the parties submitted supplemental memoranda based on the February 24, 2016 hearing. Based on the evidence and briefing presented by the parties, the Court makes the following factual findings.

### B. Findings of Fact

#### 1. Background and Initial Stop

On August 25, 2015, Officer Neifeld received an email from Detective Sergeant Claude Picard regarding Sergeant Picard's investigation into a shooting in Richmond, Virginia. (Hr'g U.S. Ex. 1 ("Aug. 25, 2015 Email").) The email forwarded another message from August 20, 2015, in which Sergeant Picard told another detective that Picard had received information from an informant ("Informant #1") who knew of "[s]ignificant drug activity" happening at five apartments in Richmond, Virginia: 1603 Hickory Street, Apartment B; 1605 Hickory Street, Apartment A; 1601 Tyler Street; 502 Fritz Street; and, 1602 Fendall Avenue, Apartment C.[7] (Hr'g U.S. Ex. 1 ("Aug. 25, 2015 Email").) Informant #1 specifically identified a "[l]ight skinned male with a boil on the left side of his cheek" who acted as a lookout for the sales at 1602 Fendall Avenue. (*Id.*; Hr'g Tr. 10.) Although the email entered into evidence at the February 24, 2016 hearing redacted Informant #1's name, Officer Neifeld stated that he had the original, unredacted email. The email revealed that Informant #1 was a male. (*See* Aug. 25, 2015 Email 1 (referring to Informant #1 multiple times as "he").)

Not long after this report, on Sunday, September 13, 2015, Officer Neifeld arrested a woman for suspected prostitution ("Informant #2"). The woman admitted to prostituting to pay for her drug addiction and provided Neifeld with detailed information surrounding drug

---

[7] All addresses are within two blocks of one another. Fritz Street runs north to south, and Fendall Street, Hickory Street, and Tyler Street intersect Fritz Street, in that order.

4

traffickers near the 1600 block of Hickory Street in Richmond, Virginia, where she had recently purchased cocaine. Informant #2 gave specific descriptions of three drug traffickers, whom she knew as "Solo," "DJ," and "Big Man." (Hr'g Tr. 42.) Informant #2 told Neifeld that DJ and Big Man, who the police would later identify as Brown, worked together to sell cocaine base. In so doing, they carried the narcotic in their pockets, and when approached for a sale, they would go into the stairwells between the apartments or into an apartment itself and make the sale.

Officer Darnell, Neifeld's partner, had been investigating DJ for other narcotics violations and presented a photograph of him to Informant #2. Another of Officer Neifeld's partners had previously arrested Solo and found a picture of him to show Informant #2. Informant #2 confirmed that the pictures identified Solo and DJ. None of the officers knew Big Man, so Informant #2 gave them a physical description of "a black male about 25 years old with a boil on his face." (Hr'g Tr. 11–12.) Informant #2 also told Officer Neifeld that Big Man carried a gun in a red lunchbox and "always" carried cocaine base in his pocket. (Hr'g Tr. 12.)

On Tuesday, September 15, 2015, Neifeld drove by the Apartment on a "spot check" and saw Brown, a young man with a boil on his left cheek, sitting in the stairwell of 1603 Hickory Street. (Hr'g Tr. 15, 27.) A red lunchbox rested at his feet. Later that day, Informant #2 called Officer Neifeld again, notifying him that she had seen Big Man in the 1600 block of Hickory Street with the red lunchbox. Informant #2 also called the day after Brown's arrest, on September 17, to confirm the arrest.

In the morning of Wednesday, September 16, 2015, Neifeld again drove by the 1600 block of Hickory Street, observing Brown sitting in the same manner as the day before. After lunch that day, Officer Neifeld, together with three other officers, returned to the area for

5

surveillance purposes. Neifeld and another officer sat in an unmarked surveillance vehicle a block south, on the 1500 block of Hickory Street. Using binoculars on the clear day, Officer Neifeld could see Brown with other men, including DJ, near the stairwells at 1603 and 1605 Hickory Street. Again, the red lunchbox lay near Brown. Officers Lee and McWhirter sat in a marked car a half-block north of the 1600 block on Hickory Street, at the corner of Fells Street and Hickory Street.

Over the course of the next 30 minutes, Officer Neifeld watched as three gaunt, older males with generally unkempt appearances wearing dirty clothing separately approached Brown. The men would walk into one of the buildings[8] on the 1600 block of Hickory Street with Brown and emerge between one and three minutes later. Officer Neifeld noticed that when the men arrived, their hands were free, but after their encounters with Brown and DJ, two of the three men each left with a hand in his pocket. Brown carried the red lunchbox with him each of these three times. Officer Neifeld believed, based on his training and experience, as well as the consistent communications shared by the informants, that the interactions with the three visitors involved drug activity. Based on his belief that he had reasonable suspicion to stop Brown for drug trafficking, Officer Neifeld made two calls: first, for the marked unit to stop Brown, and second, for a narcotics K-9 team.

2. **Detention**

Officer Neifeld did not see the marked unit's stop of Brown. Instead, because the 1600 block of Hickory is located "right behind" the precinct, he drove the surveillance vehicle back to

---

[8] Officer Neifeld admitted that his vantage point on the 1500 block of Hickory Street made it difficult to discern exactly which building and apartment Brown entered. However, he believed that the men went into 1603 Hickory Street, Apartment B.

the precinct and "[came] right back" in a marked police vehicle. (Hr'g Tr. 19, 46, 49.) He estimated that the trip took "[m]aybe a few minutes." (Hr'g Tr. 19.) When he arrived on the 1600 block of Hickory Street, Brown stood handcuffed with Officer Lee, while Officer McWhirter sat in his police car checking Brown's information. Officer Neifeld looked at the information Officer McWhirter had retrieved on the vehicle's computer, then spoke with Brown about the reason he had been stopped.

### 3. Canine Sniff

After Officer Neifeld returned to the 1600 block of Hickory Street, Canine Handler Robin Robinson arrived with her trained narcotics detection dog, "Sara." When they arrived, Sara alerted to Brown's waistband and the lunchbox. After Officer Robinson told Neifeld that Sara alerted to the area near Brown's waist, he searched Brown, finding in his left-hand shorts pocket a large plastic bag with individually wrapped white rocks. Lab reports later confirmed the substance was cocaine base. After Sara's alert on the lunchbox, Officer Neifeld unzipped the lunchbox, revealing a silver revolver firearm and an intact Philly Blunt.[9]

## II. Analysis

The Court finds that the United States has demonstrated by a preponderance of the evidence that the police stopped and seized Brown with reasonable suspicion based on specific and articulable facts. The evidence also shows that they did not unconstitutionally extend the

---

[9] Although the lunchbox did not contain any narcotics, Brown admitted to Officer Robinson that he had smoked marijuana earlier that day. Officer Robinson credibly testified that this explained Sara's alert on the lunchbox with the Philly Blunt inside. (Hr'g Tr. 76 ("[I]f [Brown] had just smoked marijuana and that was the packaging that he had it in, the odor would be there without finding any marijuana.").)

7

stop. Further, the United States has amply established the reliability of the dog used in the canine sniff. The Court will deny the Motion to Suppress.

### A. The United States Met Its Burden to Show by a Preponderance of the Evidence that Brown's Stop and Seizure Was Based on Reasonable Suspicion

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted). "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (citation omitted). A police officer may temporarily detain a person with reasonable suspicion, based on specific and articulable facts, that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968).[10] The reasonable suspicion standard is "less demanding . . . than probable cause," and requires only "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (alteration in original) (citations omitted). To determine whether reasonable articulable suspicion exists, courts must look to the totality of the circumstances, including the information known to the officer at the time of the stop and any reasonable inferences to be drawn therefrom. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

At the time of Brown's stop, Officer Neifeld knew the following facts: (1) one informant, unknown to Neifeld but known to Picard, specifically identified a light skinned male with a boil on his left cheek as participating in a drug trafficking scheme at or near 1603 and

---

[10] Brown concedes that the initial stop was a *Terry* stop.

1605 Hickory Street; (2) one known, face-to-face informant, based on personal knowledge from recent drug purchases, pinpointed Brown as a drug trafficker on the 1600 block of Hickory Street; (3) Informant #2 knew Brown to carry a gun in a red lunchbox; (4) Brown spent time with DJ, suspected by Officer Neifeld's partner, Officer Darnell, to be a drug trafficker; (5) Officer Neifeld, on two occasions, saw Brown at the location identified by the informants with the red lunchbox; (6) Brown's appearance matched the "unique description"[11] provided by both witnesses (Hr'g Tr. 47); (7) the second informant described the manner in which Brown would sell drugs by briefly entering an apartment or stairwell; and, (8) three disheveled men who appeared to be users of cocaine base approached Brown, disappeared into an apartment for only a few moments, and emerged, two with their hands in their pockets, consistent with Neifeld's experience of seeing the sale of illegal narcotics and consistent with the informants' reports.

In light of these facts and the totality of the circumstances, the Court finds that the United States has amply shown that Officer Neifeld had reasonable articulable suspicion that Brown was engaging in drug trafficking on the 1600 block of Hickory Street on September 16, 2015. Neifeld knew his partner, Officer Darnell, suspected DJ of drug trafficking and that another officer had previously arrested Solo. *See United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997). Informant #2 confirmed the identities of these men and told Neifeld that DJ and Brown worked together to sell drugs. Officer Neifeld saw activity occurring that, based on his years of experience, was consistent with drug trafficking. *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). Specifically, Officer Neifeld noticed three men, whose gaunt, unkempt appearances were consistent with narcotics users, meet Brown, enter into an apartment with him,

---

[11] Brown's presence in the courtroom confirmed how the identifying description of having a boil on his cheek could be unique to him.

and return one to three minutes later. Two of the men, after arriving with their hands free, each departed with a hand in his pocket. Neifeld credibly testified that his training and experience taught him that this activity was consistent with narcotics trafficking.

Officer Neifeld was justified in relying, at least in part, upon the informants' tips as the basis for his reasonable suspicion. *United States v. Perkins*, 363 F.3d 317, 322 (4th Cir. 2004). Although Informant #1 did not speak directly to Officer Neifeld, his information had indicia of reliability in the specific details relayed, including a particular address and Brown's unique physical description. Also, Informant #1 had given information directly to Sergeant Picard, exposing him to the "risk of reprisal" if he filed a false report. *United States v. Christmas*, 222 F.3d 141, 144–45 (4th Cir. 2000). Informant #2, by conveying information to Officer Neifeld, also exposed herself to the "risk of reprisal" for a false report. *Id.* Three additional factors support the reliability of Informant #2's tip: (1) she spoke with Officer Neifeld face-to-face, giving him the opportunity to "assess her credibility and demeanor"; (2) she based the tip on personal knowledge, having recently purchased drugs from Brown; and, (3) Officer Neifeld was able to corroborate certain details of the tip, including the location, Brown's physical appearance, the red lunchbox, and the *modus operandi* by which Brown and DJ sold narcotics. *See id.* at 144–45. Finally, the informants provided materially similar accounts with no evidence of collusion, and Neifeld confirmed important aspects of what they said.

Based on the suspicious activity witnessed, the reliable tips received from two informants, and Officer Neifeld's investigative efforts alongside his training and experience, reasonable articulable suspicion existed that drug trafficking was afoot. Accordingly, after weighing the evidence and evaluating the credibility of the testifying witnesses, the Court finds

that the United States has exceeded its burden to show, by a preponderance of the evidence, that Officer Neifeld's initial stop and seizure of Brown was constitutional.

### B. The Length of the Stop Did Not Exceed Constitutional Bounds[12]

A stop and seizure, constitutional at its inception, "'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission'" of the stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614–15 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 406 (2005)). Thus, to determine the "tolerable duration of police inquiries," the Court looks to "the seizure's 'mission'—to address the . . . violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614. During the detention, the police must "diligently pursue[ ] a means of investigation" to "confirm or dispel their suspicions quickly." *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011) (citations omitted). "An officer . . . may conduct certain unrelated checks during an otherwise lawful" stop, so long as these actions do not prolong the stop absent reasonable suspicion. *Rodriguez*, 135 S. Ct. at 1616.

The duration of Brown's stop did not exceed constitutional bounds because the officers did not prolong the stop beyond its mission and diligently pursued their investigation. First, the officers did not prolong the stop at all, because the canine sniff was within the mission of the stop: to confirm or dispel the reasonable articulable suspicion that Brown was engaging in narcotics trafficking. *Id.* In *Rodriguez* and *Digiovanni*, the police conducted a stop for traffic offenses and prolonged the stop to conduct a canine sniff for offenses unrelated to the original detention. *Id.* at 1613–16; *Digiovanni*, 650 F.3d at 506–10. Here, officers stopped Brown based

---

[12] Brown raised the issue of the length of the stop for the first time in his supplemental brief following the February 24, 2016 hearing. Because the United States had the opportunity to respond to the argument, and in the interest of justice, the Court will address the argument.

11

on the reasonable suspicion that he was participating in the trafficking of narcotics. A canine sniff of Brown to "confirm or dispel" Officer Neifeld's suspicions of this offense is consistent with the mission of the stop: to address the suspicion of the violation that effectuated the stop. *Digiovanni*, 650 F.3d at 507. The investigative information about the red lunchbox likewise placed it well within the purview of the search.

The officers also diligently pursued their investigation. The evidence adduced at the hearing demonstrated that the timeline proceeded apace. First, Officer Neifeld called for the marked unit to stop Brown. Immediately thereafter, he called for the canine unit. While Neifeld exchanged his vehicle, the marked unit officers simultaneously stopped Brown and ran his information. No evidence exists that Officer Neifeld's trip to the police precinct right behind the 1600 block of Hickory Street prolonged the stop because when Officer Neifeld returned to the 1600 block of Hickory Street, Officer McWhirter was still checking Brown's information. Officer Robinson then arrived with Sara and proceeded to conduct the canine sniff search. The evidence suggests that the canine unit arrived timely in order to advance the purposes of the original stop. Thus, Officer Neifeld's "overall course of action during [the] stop, viewed objectively and in its totality, [was] reasonably directed toward the proper ends of the stop." *Digiovanni*, 650 F.3d at 508 (citation omitted). Accordingly, because the officers did not prolong the stop and diligently pursued its mission, the detention did not exceed constitutional bounds.

C.     <u>**Sara Was Reliable and Her Alert Established Probable Cause to Search**</u>[13]

An "alert" by a narcotics detection canine can provide probable cause to conduct a constitutional search when the totality of the circumstances, "viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013). Like in other examinations of probable cause, the Court must employ a "flexible, all-things-considered approach" to determine the reliability of the dog's alert. *Id.* at 1055. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his [or her] alert." *Id.* at 1057. A court may "presume" that a dog's alert provides probable cause to search "if a bona fide organization has certified the dog after testing his [or her] reliability in a controlled setting." *Id.* Nonetheless, a defendant must always have an opportunity to challenge the evidence of the dog's reliability, and the Court should still look to the totality of the circumstances. *Id.* at 1059.

In this case, the United States established that Sara became certified as a narcotics detection dog in 2011 after completing a 480-hour training course and passing a certification exam. (Hr'g Tr. 62.) Sara maintains her skills by completing 30 hours of training each month. (Hr'g Tr. 67.) Finally, Sara has passed annual certifications for five years without a single

---

[13] Brown did not abandon this argument, but after reviewing the evidence provided by the United States, he agreed that "the case law is rather against us." (Hr'g Tr. 3–4; Def.'s Supp'l Mem., ECF No. 21 (not mentioning Sara's reliability).) The Court agrees.

13

error.[14] (Hr'g Tr. 66–67.) Such evidence at least equals prior findings of reliability in other dogs. *See, e.g., Harris*, 133 S. Ct. at 1059 (finding reliable a dog who had completed a 120-hour training course and maintained four hours of training per week, notwithstanding the dog's lapsed certification); *United States v. Green*, 740 F.3d 275, 283 (4th Cir. 2014) (affirming district court's finding that dog was reliable after completing 13-week training course, passing certification, and maintaining that certification with perfect controlled environment testing results for six years). Brown introduced no evidence to cast doubt on Sara's reliability. *Harris*, 133 S. Ct. at 1059. Therefore, based on Sara's consistently reliable testing and the considerable experience of Officer Robinson, the totality of the circumstances supports a reasonably prudent person's belief that contraband was present on Brown and inside his red lunchbox. *Id.* at 1058. Accordingly, Neifeld had probable cause to search Brown and the lunchbox.

---

[14] The Court looks to Sara's performance in a controlled testing environment, not to field results. *Harris*, 133 S. Ct. at 1057. Nonetheless, Officer Robinson testified that Sara has been utilized over 200 times in her five years as a narcotics canine and has been reliable during that time. (Hr'g Tr. 68.)

## III. Conclusion

For the foregoing reasons, the stop and seizure of Brown did not run afoul of the Constitution. The initial stop and seizure were based on reasonable articulable suspicion that Brown was engaging in drug trafficking. The officers did not prolong the seizure and diligently pursued their investigation during the detention. Finally, the canine utilized during the stop was reliable. Therefore, the Court will deny Brown's Motion to Suppress. (ECF No. 16.)

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: March 31, 2016